PETITION OF CITIZENS UTILITIES COMPANY, RE INCREASED. RATES.

(91 A2d 687)

May Term, 1952.

Present: SHERBURNE, C. J., JEFFORDS, CLEARY, ADAMS and CUSHING, JJ.

Opinion Filed October 7, 1952.

*Hubert S. Pierce* and *Milton S. Gould* (of New York, N. Y.) for the petitioner.

*Clifton G. Parker,* Attorney General, for the State of Vermont.

SHERBURNE, C. J. This is the second time this cause has been before this Court. See *City of Newport* v. *Citizens Utilities Co.,* 116 Vt 103, 70 A2d 590, where the order of the public service commission was reversed pro forma and the cause was remanded for a hearing de novo. The cause has been fully reheard, and new findings of fact and a new order have been made. Three questions are now presented for review: (1) whether certain so-called flowage rights were erroneously excluded from the rate base, (2) whether the rate of return found by the commission is supported by the evidence, and

(3) whether the commission erred in allocating interest for income tax purposes. These questions are raised or attempted to be raised by exceptions to certain findings as being contrary to the evidence, against the weight of the evidence and contrary to law, and by exceptions to the failure to find as requested.

The petitioner, hereinafter called the company, is a public utility corporation organized under the laws of the state of Delaware. It operates in the states of Arizona, Colorado, Idaho, Maine, Vermont and Washington. It supplies manufactured gas, natural gas, telephone, water, electric service and ice in one or more of these states. It also has two wholly owned subsidiaries, the Citizens Utilities Company of California, which supplies telephone and water service in that state, and Ketchikan Cold Storage Company of Alaska, which provides cold storage facilities. In Vermont the company is engaged in the generation, transmission and distribution of electricity, through its Newport Electric division, in Grand Isle county, and in parts of Caledonia, Essex, Franklin and Orleans counties.

On February 18, 1948, the company filed with the commission a revised schedule of rates which were placed in effect on March 19, 1948, by filing a bond, and on April 17, 1950, the company filed with the commission a revision of its tariffs pertaining to water heating. These two matters were consolidated and have been handled together in the findings and order of the commission.

██ ██ Whenever the company has briefed an exception to a finding we shall use the standard adopted when this cause was first before this Court, and stated on page 105 of 116 Vt, that in order for a finding to be warranted by the evidence, there must be substantial evidence in the case to support it. On review we do not weigh the evidence since its persuasive effect and the credibility of the witnesses are for the triers of fact to determine. *Schwarz* v. *Avery,* 113 Vt 175, 179, 31 A2d 916. A finding must stand if supported by any substantial evidence, although there may be inconsistencies, or even substantial evidence to the contrary. *D'Amato* v. *Donatoni,* 105 Vt 496, 502, 168 A 564.

## Flowage Rights

Under the heading "Property Held for Future Use" the commission finds: "Petitioner owns certain flowage rights which are included in its service account. The company has no definite plans for the use of such property in the near future and said property is

not used or useful in serving the public. We cannot agree with the petitioner that this property should be included in its rate base and we have deducted the cost of these rights in the amount of $43,201.50 in our final calculations of said base." The company excepted to the finding * * * "that certain 'flowage rights,' referred to under the hearing 'Property Held for Future Use,' are not used or useful in serving the public and should, therefore, be deducted from the calculation of Petitioner's rate base."

Our attention is called to evidence showing that of the total amount of $43,201.50, $201.50 represents the cost of a small piece of land below the company's Newport generating station which was purchased for a future site of a station, and that the rest of the total amount, or $43,000.00 represents the cost of land and water rights above its Newport generating station and below its Charleston generating station, which were purchased for a possible hydro-development. In its main brief the company insists that the total amount of $43,201.50 was improperly excluded from its rate base. However, in its reply brief it admits that the sum of $201.50 for the cost of the small piece of land, on the basis of the record, was properly excluded therefrom.

■ As we view the exception to the finding it was general to the extent that it covered all the rights that were included in the total amount of $43,201.50. Since $201.50 of the amount, representing the cost of the small piece of land, was properly excluded as against the exception, the exception is without avail as to the rest of the property. *Little* v. *Loud,* 112 Vt 299, 303, 23 A2d 628, and cases cited.

Had the company saved the question by a proper exception it would be no better off. The burden of proving that the up stream land and water rights are used and useful in serving the public was upon the company. All the evidence in behalf of the company on this question came from Joseph C. Briggs, its treasurer, who has supervision of its accounting and financial work, and who testified that "at one time the company thought that they might be able to develop additional hydro and acquired these land rights, but it so turned out, and this is what is the best informed opinion that I have been able to get, that we need those land rights to protect our stream flow. * * * Now if we were to give up the rights that we purchased along the river, there is a chance someone else might be able to use

those rights and interfere with our control of the stream flow and reduce our hydro generation." Although this evidence is uncontradicted it does not come within the rule stated in *Neill* v. *Ward,* 103 Vt 117, 160, 153 A 219, that when a credible witness distinctly and positively testifies to a fact and is not contradicted, and there is no circumstance shown from which an inference against the fact testified to can be drawn, the fact can be taken as established. Our attention is called to no evidence that the witness ever examined the river in connection with locating the up stream land and water rights, or for determining if a dam were to be built there it could be operated in such a way as to interfere with the stream flow at the Newport generating station, to meet the State's claim that his evidence was based upon hearsay. Moreover the last quoted sentence of his testimony is not positive. He does not state that if someone else owned these rights he would be able to use them in such manner as to interfere with the stream flow at the company's generating station and to reduce its hydro generation. Instead of the phrase "would be able" he uses the phrase "might be able."

There is another fact which should be taken into consideration. This land and these water rights were purchased for the purpose of erecting a dam and developing power. When a dam is erected across a river it sets the water back against the up stream river banks and over them to at least the level that the surface of the water is maintained at the dam. The right to so set the water back is a flowage right. We can safely assume that the water rights referred to are flowage rights. If this water power had been developed the good faith of management in expending $43,000 for land and water rights would be presumed. *Petition of New England Tel. & Tel. Co.,* 115 Vt 494, 510, 511, 66 A2d 135. To have accomplished the purpose for which the company now wants to use these rights to protect the stream flow at its Newport generating station, it would only have been necessary to purchase from the same riparian land owners who sold it the land and flowage rights the right to have the water flow past their lands at its natural level. It is self evident that such right would cost far less than the right to set the water back against and upon such lands. Consequently the good faith of management in allocating all of such $43,000 to protection of stream flow cannot be presumed.

In support of the finding there was the testimony of the company's former manager of its Newport Electric Division that he was

familiar in a general way with these rights, and that he considered that they were not in use.

## RATE OF RETURN

The commission finds that for the years 1948, 1949 and 1950 and for the next few years the company can reasonably finance plant expansion and maintain its credit with a return of 6½% on the rate base allowed in this case, provided it is able to earn the same return on its other operations, and that such return will be sufficient to pay all interest charges, dividends on preferred stock, maintain its present dividend rate on common stock, and leave a substantial balance for surplus. It does, however, allow a return of 7% for the years 1948, 1949 and 1950 because the company's reports for those years already reflect the revenues allowed and if the company had to make a downward revision of its past earnings there might be an adverse effect upon its credit position.

Throughout its findings the commission shows that it was aware of the rule governing a proper rate of return, as recently twice announced by this Court as follows: The fixing of just and reasonable rates involves a balancing of the investor and consumer interests. From the standpoint of the investor it is required that there be enough revenue for capital costs of the business, including service on the debt and dividends on the stock. The return to the equity owner should be commensurate with returns on other investments in other enterprises having corresponding risks. The return should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. From the investor point of view a reasonable return should also provide for something to be passed to the surplus account. *Petition of Central Vermont Public Service Corp.*, 116 Vt 206, 216, 71 A2d 576; *Petition of New England Tel. & Tel. Co., supra*, 512, 513. As applicable to this case the following additional rules apply: A public utility has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. *United Railways & Electric Co. of Baltimore* v. *West*, 280 US 234, 50 S Ct 123, 74 L ed 390. A utility has no right to a rate sufficient to provide for future extensions or additions to its plant. 73 CJS Public Utilities, § 25 p. 1039; *Bluefield Water Works & Improvement Co.* v. *Public Service Commission*, 89 W Va 736, 110 SE 205, certiorari denied 258 US 622, 42 S Ct 315, 66 L ed

796; *City of Huntington* v. *Public Service Commission,* 89 W Va 703, 110 SE 192.

The testimony as to a necessary rate of return came from Richard L. Rosenthal, president of the company, who has had much experience in marketing securities; Dale R. Goubleman of the Federal Power Commission staff who is engaged in conducting research in connection with the subject of fair return for electric and gas utilities and has testified as a staff witness before the Federal Power Commission on the subject of rate of return on several occasions, before the Utah Public Service Commission as a staff witness twice, and before the Vermont Public Service Commission as a staff witness in the matter of the Central Vermont Public Service Corporation; and Dr. Martin L. Lindahl of Dartmouth College, who has made studies and research in the issuance of securities, financing of, and cost of money to utility companies engaged in the electric, gas, water and telephone business. Except that the commission reports that Mr. Rosenthal testified that the company must have a return of 8% for 1948, 1949 and 1950, and a return of 7½% for the future, and that Mr. Goubleman and Dr. Lindahl were of the opinion that a return of about 6¼% was sufficient to maintain the company's credit and to attract new capital on favorable terms, no direct reference is made in the findings to the testimony of these witnesses or to their exhibits.

We quote from the findings which we have numbered for convenience:

1. "Two factors which must be considered in determining the cost of equity capital are the actual earnings available for dividends and the dividends paid. To many, if not most investors, the amount which they actually receive for the use of their money may be a more important consideration than earnings which are left in the business and which, while they increase the value of the capital investment, are not available as income to the investor.

2. "The company's capitalization as of May 1950 after giving effect to its new bond issue of September, 1950, was:

| | |
|---|---|
| Funded Debt | $ 7,758,470 |
| Preferred Stock | 51,170 |
| Common Stock Equity | 3,684,079 |
| Total | $11,493,719 |

3. "The average cost of Funded Debt was 3.49% or $270,771 annually and in Preferred Stock, 5% or $2,559.

4. "A return of 6½% on its capital would provide $747,092, and after provisions for interest and preferred stock dividends, would leave $473,762 available for equity. Similarly a return of 7% would provide a gross return of $804,560 and $531,230 for equity.

5. "In 1949, Citizens paid out $182,995.05 in cash dividends on its common stock consisting of 264,974 shares at the end of the year. In addition it paid a stock dividend of $64,357.75. We consider a stock dividend as simply another way of dividing the pie without increasing its size. If a stockholder owning 100 shares or 10% of the stock of a corporation receives a stock dividend of 3 shares, his holdings increase to 103 shares but it is only 10% of the stock. There may be a slight advantage for tax purposes to a stock dividend but we find this to be a minor consideration.

6. "A common dividend payment of $183,000 out of net earnings of $473,762 or $531,230 is a pay-out of only 38% and 34% respectively. This is a very low pay out and we find this policy has the effect of requiring customers to pay higher rates in order that additions and replacements of property can be made out of earnings instead of issuing new securities.

7. "A return of 6½% and 7% on total capital gives petitioner a return on equity of 12.86% and 14.42% respectively. We have taken judicial notice of the present earnings, dividends and yields, of Citizens' common stock. The June 7, 1951, issue of 'Public Utilities Fortnightly,' a reliable source of information as indicated by the record, shows that on May 11, 1951, Citizens common stock with earnings of $1.93 per share for the year 1950 was selling on the market at about $15.00 per share, or at a return of 12.87% with a dividend pay-out of only 41%.

8. "There is no evidence that the company will need large sums of equity capital in the near future. At all times material in this case, the company has provided all permanent capital from earnings and debt securities. An increase in cash dividends on its present stock will make new issues more desirable. At its 1949 dividend rate, petitioner will have available, on our proposed return, some $300,000 of annual earnings for plant expansion before any

new capital is required. In 1949, Citizens experienced an operating loss of $7,723.83 on the Bangor property which it purchased in 1948."

All of the facts stated in these 8 findings, except the first sentence in finding 8, are to be treated as established, since as we will show in detail, certain findings were not excepted to, and the exceptions to the other findings are either without avail, or are waived because not briefed, or are overruled.

■ The company attempted to except to the finding we have numbered one in these words: "Petitioner excepts to the finding that 'many, if not most investors may' attach more importance to dividends than to earnings." This exception misstates the finding. The finding mentions earnings which are left in the business, whereas the import of the exception is all the earnings made. Consequently this finding as made is not excepted to and the exception taken is of no avail.

■ Findings 2 and 3 are not excepted to. Finding 4 is excepted to, but not briefed. The first two sentences in finding 5 are not excepted to. The company excepted to the rest of this finding in these words: "Petitioner excepts to each and every part of the finding that stock dividends are not to be considered in computing the pay out of Petitioner to its stockholders." Here again the exception misstates the finding, but aside from that, the company agrees in its brief that the finding is correct, except for the characterization of the tax benefits of a stock dividend as minor, but only so far as it has gone in the discussion of stock dividends. Since the finding is in part sound as against the grounds stated in the exception, the exception is consequently without avail. *Little* v. *Loud, supra,* 303, and cases cited. The first sentence of finding 6 is excepted to but not briefed. The clause "This is a low pay out" is not excepted to. The rest of finding 6 is excepted to but not briefed. The first sentence in finding 7 is excepted to but not briefed. The remainder of this finding is not excepted to. The first sentence in finding 8 is excepted to and briefed. The second sentence is not excepted to. The third sentence is excepted to and briefed. The last sentence is not excepted to. We will later on consider the exceptions to the first and third sentences in finding 8.

■ The company filed numerous requests for findings and severally excepted to the failure of the commission to so find. None of

these exceptions state any ground or any reason why the findings should have been made. The company also generally excepted to the failure to find each and every proposed finding submitted as being contrary to the evidence and contrary to law. All of these exceptions are too general to be available. *Little* v. *Loud, supra,* 302.

The company excepted to the statement in the findings that Mr. Goubleman and Dr. Lindahl were of the opinion that a return of about 6¼% was sufficient to maintain the company's credit and to attract new capital on favorable terms. Mr. Goubleman testified on cross-examination that, in his opinion, if the company were allowed a return of around 6¼% it would be able to attract capital. On re-direct examination he testified that he felt that if the company increased its pay-out to a point where it was more or less in line with the other companies shown, referring to an exhibit he had prepared, he believed that the company could attract capital on the basis of a return of 6¼%. In his exhibit he lists 25 large electric operating utilities, whose average earnings price ratio is 7.3%, common stock and surplus 36.1% and pay-out 73.5%, and 13 small electric operating utilities with total revenues comparable with or less than the company, with an earnings price ratio of 10.3%, common stock and surplus of 30.5% and pay-out of 60.7%. This witness testified that his studies led him to believe that investors in electric utilities are buying more on a yield basis than on the earnings-price ratio basis, because they are more interested in getting that dollar in their pockets than seeing that the dollar is earned by the company. Dr. Lindahl, in answer to a question as to the return rate which should be received by the company in order that its common stock equity may receive a return which would attract capital, testified: "Well, I haven't calculated the exact amount, but it would be around between 6.0 per cent and 6.22 per cent I should think, I haven't worked it out." His previous testimony shows that he based his conclusion upon an exhibit prepared by him which lists 15 public utilities having total revenues ranging between $5,041,961 and $2,509,264 as contrasted with $3,903,299 for the company, whose average earnings price ratio for the years 1945-1949 is 10.8% as contrasted with 17.0% for the company, and an average pay-out of 59.5% as contrasted with 32% for the company. For the years 1945-1950 this exhibit shows an average earnings price ratio of 10.7% and pay-out of 60.2% as contrasted with 16.7% and 32.6% respectively for the company. This exhibit also shows for 1949 an average of 33.1%

equity as contrasted with 32.7% for the company. Taking the higher earnings price ratio the witness adds a percentage to cover the cost of issuing securities and arrives at a figure in the neighborhood of 12% for common stock equity. In computing the earnings price ratios the witness used the reported earnings of the 15 companies per share, based on the number of shares at the end of the year. Later this witness made another exhibit adjusting these price ratios up about .3% by getting the weighted average of the number of shares outstanding each year in cases where there had been stock issues or stock dividends. On another exhibit prepared by this witness is a computation showing that a return of 6.22% on the company's capitalization as shown in finding 2 would give a return of 12% on common stock equity or $442,089, which would be 61.79% of the total income. This witness was of the opinion that pay-out was an important factor in determining the reaction of investors, and that the borderline on pay-out should be around 60%. On the basis of a return of 6.22% and a 60% pay-out, 7.2% on the company's common stock equity would be available for dividends and $176,835 could be passed to surplus. On the basis of a 70% pay-out, 8.4% on common stock equity would be available for dividends and $132,627 could be passed to surplus. Although both Goubleman and Lindahl may have been shaken somewhat on cross-examination, their testimony viewed in the light most favorable thereto fairly and reasonably supports the excepted-to statement in the findings. This exception is overruled.

The excepted-to statement in finding 8 that an increase in cash dividends on its present stock will make new issues more desirable is supported by the testimony of Mr. Goubleman and Dr. Lindahl just referred to. This exception is overruled.

Under its exception to the first sentence in finding 8 that there is no evidence that the company will need large sums of equity capital in the near future, the company in its reply brief calls our attention to the testimony of Mr. Rosenthal that the company is budgeting expenditures of over $1,600,000 for its total construction program for 1950, and that only if its rates are such as to indicate the probability of realizing its desired rate of return can it be assured of the ability to finance a program of the magnitude which it may have to contemplate over a period of extended operation in Vermont. We do not interpret this testimony as indicating any large expenditure in Vermont in the immediate future, but as indicating that the bulk,

if not all, of the planned expenditures were to be made upon other parts of its widely extended properties. In so far as the finding relates to the need of the company generally for large sums of equity capital in the near future the finding is clearly erroneous, but as applied to its Vermont operations it is not shown to be wrong, and whether or not the company needed to sell securities to finance construction work outside of Vermont is here immaterial.

The company excepted to the findings of the commission relative to rates of return allowed. In its brief it argues that the evidence of Mr. Rosenthal as to the company's requirements was unassailed and that the commission's conclusions are unsupported by any evidentiary basis or finding of fact. It rejects the evidence given by Mr. Goubleman and Dr. Lindahl as valueless. There is no need to discuss the reasons given why we should disregard the evidence of these two witnesses. If the company desired to raise a question as to their competency as experts or as to the way they arrived at their opinions as to what was a sufficient return it should have saved and briefed exceptions to their testimony. See *Squires* v. *O'Connell,* 91 Vt 35, 43, 99 A 268; *Hathaway's Admr.* v. *National Life Ins. Co.,* 48 Vt 335, 350, 351. We are faced with a finding that Mr. Rosenthal testified that the company must have certain returns and that Mr. Goubleman and Dr. Lindahl were of the opinion that a return of about $6\frac{1}{4}\%$ was sufficient to maintain the company's credit and to attract new capital on favorable terms, and have found that the last part of this finding is supported by the evidence. Since the credibility of these witnesses and the persuasive effect of their testimony were matters for the members of the commission to determine, there was a sufficient basis, in connection with the established facts in the findings numbered 1 to 8 to support the conclusions of the commission as stated at the outset of our discussion of the rate of return.

In its brief the company states that since 1948 its common stock has always sold at a price at least 15% over book value, and argues that a stock dividend is a real dividend. The State's witnesses deny that it is. Because of an insufficient exception the findings on this matter are unchallenged. The company frankly states that one of the advantages of a stock dividend is the saving of expense in raising additional capital in order to expand its facilities and to meet growth requirements. Then, assuming that the price of its stock would be higher if the percentage of dividends paid out was higher

and that the stock dividend is not a dividend, it states that the commission has no right to override the managerial judgment of the board of directors. This last poses a question similar to that presented in *Petitions of New England Tel. & Tel. Co.*, 116 Vt 480, 502-504, 80 A2d 671, relative to the debt ratio, which was there claimed to be a matter for the exclusive determination of management. As debt ratio substantially affects the manner and cost of obtaining new capital, so may the pay-out on common stock on the assumption made. The company is seeking higher rates on the cost of capital theory. If increased pay-out would lower the cost of capital the commission could give consideration to it.

In this connection another matter should be considered. Mr. Rosenthal testified that the company must have a return of 8% for 1950. A computation shows that would leave $646,167 available for equity. This is a return of over 17.5% on equity. It appeared in evidence that at the 1950 dividend rate and based upon approximately 275,000 shares approximately $216,000 was required annually for its common stock dividends. Subtracting this last sum from the amount available for equity leaves $430,167 to add to surplus or for stock dividends. On this basis, had the company expended $1,600,000 for its 1950 construction program as budgeted, it probably would not have had to sell any common stock to finance the program since the amount of $430,167 is as great a percentage of $1,600,000 as the common stock equity is of total capital as shown in finding 2. As we have noted a utility has no right to a return sufficient to provide for future extensions or additions to its plant.

### ALLOCATION OF INTEREST FOR INCOME TAX PURPOSES

As we have shown, the company is an operating company and also a holding company. As permitted by the Federal income tax law it makes a consolidated return. Its long term debt is in the form of first mortgage and collateral trust bonds issued under a mortgage bond indenture. Under the indenture its subsidiaries may borrow only from it and all of their stock must be owned by it. All of the stock of its subsidiaries and all of their debt are deposited as collateral under the indenture with the indenture trustee.

In arriving at the cost of service for the years 1948, 1949, 1950 and 1951 the commission has included items to cover the Federal income tax and the Vermont franchise tax, and states that in computing taxes on income the company is allowed to deduct such items

as interest, amortization of bond discount and expense, and miscellaneous income deductions before arriving at taxable income. In its 1948 Federal income tax return the company deducted $222,058.25 of such items in arriving at its computation of the amount due the Federal government. The commission reports that the company contends that in computing Vermont's portion of Federal income taxes it is impossible to allocate any portion of this sum to Vermont and, therefore, Vermont's share of Federal income tax should be computed with no income deductions. The State's claim that the company made the same contention relative to subsequent years appears to be supported by the findings, and there appears to have been no contention to the contrary until the company filed its exceptions to the allocation made by the commission. However, when the company filed its Vermont franchise tax returns for 1948 and 1949 it took somewhat larger credits than the commission has allocated to it on its Federal returns, but the commission finds no evidence that the company underpaid its tax obligations.

The commission finds that an equitable portion of the credits for interest, amortization of debt discount and expense must be allocated to Vermont in computing the company's Federal income tax for Vermont, and that such an allocation "can be best provided by applying the ratio of Vermont's net plant to company's total net plant (utility plant less reserves for depreciation, depletion and amortization) based on the average of beginning and year end balances" and computes the percentages based on the company's actual figures of net plant in its 1948 and 1949 annual reports to the commission, showing total net plant and Vermont net plant. For 1950 and 1951 the commission uses the 1949 year end percentage.

As it turns out the figures for company's total net plant only include that part it owns as a separate corporation, and does not include the utility plant owned by its two wholly owned subsidiaries. The company says in its brief that the company directly owns 70% of the consolidated net plant and its subsidiaries own 30%. The company now agrees to the principle applicable to the allocation of the expense of interest as stated by the commission and previously quoted, but argues, under an appropriate exception, that the commission failed to allocate the interest on long-term debt and amortization of debt discount and expense on the basis upon which it stated such allocation should be made, claiming that the phrase "total net plant," as used by the commission, means "total consolidated net

plant," of the company and its subsidiaries. The company claims that the nature of the indenture securing the bonds makes the plant account of the subsidiaries just as much security for the bonds as the corporate plant account of the company, which is directly mortgaged. It states that the only reason that it has wholly-owned subsidiaries for ownership in California and Alaska rather than directly owning such property, is that the applicable laws of California and Alaska require or make advantageous the use of domestic corporations in those jurisdictions.

Without deciding that under every possible event that might occur the mortgage indenture makes the plant account of the subsidiaries just as much security for the bonds as the corporate plant account of the company, we think that it does so substantially. In its findings the commission has used the total capitalization of $11,493,719 as shown in finding 2, to compute the effect of the returns it has allowed, thereby accepting that figure as representing the total prudent investment or net plant of the company and its subsidiaries. It has thus treated the entire enterprise as unitary in character. Under the terms of the mortgage indenture the commission should also have treated the long term debt as unitary in character. An exhibit prepared by Mr. Goubleman shows the total capitalization as of December 31, 1949, to have been $10,579,160. The figure of total net plant as of that date used by the commission was $7,291,244.45. We are satisfied that the commission inadvertently and erroneously used figures representing total net corporate plant rather than the larger figures for net consolidated plant in computing percentages. Although we are inclined to charge the error of the commission to the unreasonable stand taken by the officials of the company before the commission, and to think that had they cooperated in presenting the matter to the commission as it has been presented to us, the error would not have been made, we are satisfied that in fairness and justice the error should be corrected. The result will be that smaller sums for interest, amortization of debt discount and expense will be deducted in computing the company's Federal income taxes upon its Vermont plant for the years in question. This will increase somewhat the allowances for such taxes, and consequently the total cost of service, and may require a slight adjustment in the rate schedules ordered by the commission. The company's exception 39 to the findings is sustained.

*The order of the Public Service Commission is reversed, and the cause is remanded for the limited purpose of recomputing the allowances for Federal income taxes and for cost of service for the years 1948, 1949, 1950 and 1951, and for the purpose of making any necessary adjustments in the rate schedules, all in accordance with the views herein expressed. In all other respects the findings and conclusions of the commission are approved. In computing allowances for Federal income taxes the Commission shall use no percentages of interest on long-term debt, amortization of debt discount and expense, and other interest charges, lower than those claimed by the petitioner in its exception 39 to the Commission's findings. To be certified to the Public Service Commission.*