# Petition of Paul Latourneau et al
## v.
## Citizens Utilities Company

[ 209 A.2d 307 ]

February Term, 1965

Present: **Holden, C. J., Shangraw, Barney, Smith and Keyser, J. J.**

Opinion Filed April 6, 1965

*Clifton P. Parker* and *Shea, Gallop.*
  *Climenko & Gould* for petitioner.

*Robert W. Larrow* special counsel for the public.

**Smith, J.**  The subject of this appeal is the petition of the Citizens Utilities Company for requested increases in its rates by a petition filed with the Public Service Commission on March 8, 1963. Upon petition from more than five persons adversely affected by the proposed rate charges and praying that the Commission investigate the matter, the Commission set the matter for hearing, and suspended the proposed schedule of rates and charges until final determination of the proceedings before the Commission.

Special Counsel for the Public entered a motion to dismiss the petition. At a hearing on such motion, the motion to dismiss was withdrawn, and by stipulation, Citizens agreed that it would not put its proposed rates into effect under bond prior to February 8, 1964.

Hearings on Citizens' petition were held in Newport on October 3, November 5, 6 and December 11, 12 and 13th, at which hearings all interetsed parties were heard. Findings of Fact and Order were filed by the Commission on February 7, 1964 and an Amended Order was filed by the Commission on March 4, 1964. While the petition filed by Citizens requested proposed rates averaging out to a 16% increase on all rates then in effect, the Order of the Commission only allowed Citizens to amend its rate schedule as of February 8, 1964 in order to realize additional revenues of 3%.

Citizens has taken its appeal here under the provisions of 12 V.S.A. §§2381 - 2385 from certain Findings of Fact as well as the Order and the Amended Order to this Court. The appeal is directed to the exclusion by the Commission of certain items submitted by Citizens as parts of the rate base upon which Citizens requested a rate of return of between 6.8 and 7.6 per cent, as well as to the finding by the Commission that a rate of return of 6.11 per cent was fair and reasonable.

*Exclusion from Rate Base of $452,500 costs capitalized for Prouty Rights and annual Amortization charges associated therewith.*

Prouty Rights, so-called, are lands and penstocks located on the Clyde River. They were originally leased for 25 years in 1930 from

one Abbie D. Prouty. The lease provided Citizens with an option to purchase such rights before October, 1935, for the sum of $150,000. In the event that the option was not exercised (as it was not) the lease then provided that within six months after its expiration, Citizens must purchase the rights either at a mutually agreed price, or bring condemnation proceedings "before the tribunal then having jurisdiction" within six months from the expiration date. If the lessee failed to bring such proceedings, then it was to pay to the lessor $300,000 for the land described in the lease. See *Citizens Utilities Co.* v. *Prouty,* 122 Vt. 443, 176 A.2d 751.

The course of the proceedings to acquire such rights by Citizens is set forth in Finding No. 30 made by the Commission:

"Citizens instituted condemnation before the Vermont Public Service Commission on March 27, 1956, three days prior to the expiration of the six months period. No agreement ever was reached between the parties as to price, and this was the only proceeding instituted by Citizens. The owners of the property brought suit in Federal Court for the $300,000, claiming that the Public Service Commission had no jurisdiction because Citizens had not obtained the necessary license from the Federal Power Commission. The Federal Power Commission itself investigated, and after making a determination that the Clyde River was navigable, on Feb. 16, 1959, it ordered Citizens to apply for a license for its future operations. Subsequently, on November 10, 1960, the Public Service Commission issued an order awarding compensation in the sum of $95,000 for the property.

The Vermont Supreme Court, however, ruled that the Public Service Commission had no jurisdiction because Citizens had no license from the Federal Power Commission or any Certificate of Public Good from the Public Service Commission. The Federal Courts have finally determined that Citizens must pay the $300,000 stated in the lease, plus interest and expenses totalling an additional $250,000."

The reasons by virtue of which the Commission found that the maximum cost that Citizens could include in its base rate was $95,000 in its Finding of Fact No. 32, are set forth in Finding No. 31:

"The decision of the United States Court of Appeals for the Second Circuit, dated June 24, 1963, contains the following language:

'Citizens Utilities apparently thought it was worth the risk of having to pay $300,000 for the property to attempt to avoid having

to secure the license required of it by federal law, with the attendant federal regulation. It is hardly reasonable to suppose that Citizens Utilities is surprised by the outcome of this litigation and that it did not realize in 1956 that it could have avoided the possibility of a sale at $300,000 at least by instituting parallel proceedings with the Federal Power Commission. The mistaken gamble is tantamount to a deliberate rejection of the condemnation alternative.'

The action taken by Citizens in this matter clearly appears to have been an attempt to evade the requirements of filing an application with the Federal Power Commission for a license with the hope of avoiding the attendant regulation. This procedure created very substantial additional costs and interest charges which Citizens now seeks to place on the rate payers in the Vermont service area. Citizens could easily and quite properly have protected itself by not waiting until the last minute to institute proceedings before the Public Service Commission or by filing concurrently with the Federal Power Commission. Management personnel of Citizens in Stamford, Connecticut, are highly paid, experienced and intelligent personnel. But in this instance they took a deliberate, unnecessary and callous gamble which resulted in the raising of the cost of the Prouty Water Rights from $95,000 to $530,000. We do not believe that the electric consumers of the State of Vermont should bear the burden of this managerial form of Russian Roulette. Such risks are more properly the burden of the stockholders of the company."

It is the contention of Citizens that the Commission's conclusionary finding that "a deliberate, unnecessary and callous game" upon the part of management of Citizens was the cause of Citizens having to pay $300,000, plus interest, legal expenses, etc., for the Prouty rights is not substantiated by the evidence presented before the Commission. On the contrary, says Citizens, the action taken by them relative to the Prouty water rights was in an effort to keep the cost of these water rights down to the equitable minimum. The contention is also made that this is an infringement upon the rights of management by the Commission in the conduct of Citizens' business.

The function of a public service commission is that of control and not of management, and regulation should not obtrude itself into the place of management. The acquisition of the water rights here involved, the price to be paid for such acquisition, and the expenses relative thereto called for the exercise of judgment on the part of management. Good faith on its part is to be presumed. Although expenses

chargeable to this matter should be scrutinized with care the Commission had no authority to disallow or reduce them unless it clearly appeared that they were excessive or unwarranted or incurred in bad faith. *Petition of New Eng. Tel. & Tel. Co.*, 116 Vt. 480, 501, 80 A.2d 671; *Petition of New Eng. Tel & Tel. Co.*, 115 Vt. 494, 511, 66 A.2d 135.

We think the evidence before the Commission justified its conclusion that expenditures by Citizens in acquiring the Prouty rights were unwarranted and that they could not, in toto, be used as rate base, although such conclusion may have been expressed in unnecessarily colorful terminology.

Citizens could have acquired such rights by the payment of $150,000 prior to October 1935 under the option incorporated in its agreement with Prouty. After the time for exercising the option had expired it then had six months to agree upon a price for such rights with Prouty, or to bring a condemnation proceeding "before the tribunal then having jurisdiction." While it did institute such condemnation proceeding before the Public Service Commission, it did so without the Certificate of Public Good required by Vermont law to give the Public Service Commission jurisdiction of the condemnation matter. Prior to the time such proceedings were concluded before the Public Service Commission, Citizens was ordered to obtain a license from the Federal Power Commission on February 16, 1959. The possession of such license would have given the Public Service Commission jurisdiction of the condemnation hearing. *Citizens Utility* v. *Prouty*, 122 Vt. 443, 452, 176 A.2d 751. Citizens, however, did not see fit to comply with the order from the Federal Power Commission to obtain such a license, although in the case of *In Re Bellows Falls Hydro-Electric Corp.*, 114 Vt. 443, 47 A.2d 409 (1946) this Court held that the Vermont Public Service Commission has no authority to authorize a project or facility upon a navigable stream over which the Federal Power Commission has assumed jurisdiction to issue a Certificate of Public Good which is the grant of such authority.

■ The sum of $300,000 plus interest and legal expenses which Citizens eventually had to pay for its acquisition of the Prouty Rights was, as Citizens admits in its brief, a payment of "liquidated damages", and its payment was brought about by unwarranted conduct by Citizens in choosing the course which it followed. Citizens elected to expose itself to the liquidation damages, plus the costs of private litigation, rather than accede to the jurisdiction and control of the federal administrative agency which had full jurisdiction of the matter. The ex-

cessive burden imposed as a result of this gamble should not be assigned to the rate paying public, nor have such damages any relationship to the actual value of the land.

We cannot agree, however, that the $95,000 figure adopted by the Commission is the net value of the property. This figure was apparently taken from the condemnation figure reached in *Citizens Utility Co. v. Prouty*, dated November 10, 1960. However, that proceeding was found to have been held without jurisdiction in the Commission by this Court in *Citizens Utility v. Prouty*, 122, Vt. 443, 176 A.2d 751.

■ Nor do we think that the option figure of $150,000 can be used as a valuation for the reason that such valuation was made in 1930, while Citizens did not acquire the property until 1956. Valuation should be based on evidentiary facts relating to a time certain. *Ohio Bell Tel. Co. v. Public Utilities Commission*, 310 U.S. 292; 81 L. Ed. 1092, 1099. There is here required a hearing by the Commission to hear evidence and determine as of 1956, the time of acquisition, the valuation of the property.

We find no error in the finding of the Commission that "since this property has been in service since 1955, it should be capitalized as of that date and depreciated on a 38-year basis over the remaining life of the project." Such finding is amply supported by the evidence.

*115 KV H-Frame line.*

In 1960 Citizens constructed an H-Frame line, so-called, from Highgate to Richford. It is constructed with a capacity of 115 KV but has been, and at the time of the hearing was still operated at 48 KV and is operated parallel with and tied into Citizens' 48 KV system at each terminal. The costs of construction of such line, together with land rights, was $529,715.

The Commission eliminated from this part of the proposed rate base by Citizens, the sum of $239,097. In its Finding No. 28 the Commission stated:

"We find that the excess capacity of the H-Frame line is neither used nor useful for utility purposes, nor will become so in the immediately foreseeable future. We find that the additional costs of $251,710 associated with this excess capacity should be eliminated from the rate base, and that the depreciation reserve associated therewith should be reduced by $12,613, thereby reducing the amount of the rate contended for by the company in the net amount of $239,097."

The determination of the Comission in this reduction of the rate base sought by Citizens here excepted to, can be divided into two decisions: first, that the construction of the 115 KV H-Frame line by Citizens did not meet any need in the foreseeable future for utility purposes; second, that Citizens should only be allowed as part of their rate base such part of the sum requested as would have been necessary for land acquisition and construction of a 48 KV line over the same route, plus depreciation reserves properly associated with such a lesser construction.

It necessarily follows that if we here find that the Commission was in error in excluding the cost of the 115 KV H-Frame line from the rate base of Citizens we need not concern ourselves with claimed errors in the computation by the Commission in the reduction of $239,097 in this part of the rate base.

■ The rule followed by us in dealing with the question of property held for future use "recognizes that business judgment must be employed to anticipate future needs and that this judgment cannot be arbitrarily interfered with." The test generally applied is whether the time for using the property in question is so near that it may properly be held to have the quality of working capital. The question is one of fact to be determined by the Commission.

The Commission treated the 115 KV line as a facility built for future use, and treated it the same as property under construction. But the 115 KV H-Frame line here concerned was fully constructed, and while not used to its full capacity, was in use for the transmission of 48 KV of power. It was not property held only for future use as were the properties involved in *Petition of New Eng. Tel. & Tel. Co.*, 115 Vt. 494, 506, 66 A.2d 135; *Petition of New Eng. Tel. & Tel. Co.*, 116 Vt. 480, 488, 80 A.2d 671; or *Petition of Citizens Utilities Company Re Increased Rates*, 117 Vt. 285, 288, 91 A.2d 687.

The Commission found that conditions existing prior to 1960 demonstrated that Citizens' transmission facilities needed to be supplemented. The evidence was clear that the 115 KV H-frame line provided more reliable service for the transmission of 48 KV power to Citizens' customers than would have been furnished by a transmission line capable of transmitting only 48 KV. And, while witnesses for the Public and Citizens disagreed upon the exact date when such line would be used at its full 115 KV capacity, there was no disagreement that such use would come well within the life of the transmission line.

The Commission made no finding that Citizens' management used

poor business judgment in constructing this H-frame line. Had Citizens' management, knowing of the foreseeable future need for a transmission line capable of transmitting 115 KV of power, then proceeded to build a 48 KV line which would necessarily have to be discarded and a 115 KV line constructed to meet the foreseen future need, such management might well have been found lacking in good business judgment. Management must plan for the future to meet the demands of the people for additional service. Construction to meet such demand cannot be started one day and completed the next. *Petition of New Eng. Tel. & Tel. Co.,* 115 Vt. 494, supra, at 504.

■ The findings of the Commission were that the land acquisition costs, as well as the costs of construction of this 115 KV H-frame line were not excessive and were in line with the costs of similar construction by other utilities. We hold that the Commission was in error in its elimination of $239,097, Citizens' costs for such line construction, from the rate base.

Citizens has also excepted to the finding of the Commission which stated: "The Public's figure of 25,650 mwh was arrived at by relating actual monthly production to actual monthly stream flow over the period 1957 - 1962, and applying the resultant average to historical stream flow. We see no reason to make any adjustment in this figure."

■ The objection of Citizens, as we understand it, is that evidence offered by them was contrary to the finding of the Commission. This finding (No. 43) is based upon the actual experience figures over the period 1957 - 1962, as compared with adjusted estimates offered in evidence by Citizens. Actual experience is more convincing than adjusted estimates. *Petition of New Eng. Tel. & Tel. Co.,* 120 Vt. 181, 185, 136 A.2d 357. The Commission has authority to choose the criteria determinative of an issue of fact and may reject adjustments which it regards as immaterial to the criteria adopted. *In Re Petition of Central Vermont Public Service Corp.* 116 Vt. 206, 210, 71 A.2d 576. The finding is sustained.

*Exclusion of $50,000 of president's salary and $62,135 of labor costs from Citizens' administrative and general expenses.*

Finding No. 48 reads as follows:

"In addition, the evidence shows that the President of Citizens is paid a salary in the neighborhood of $70,000 a year. He also received a bonus of $2,000 a year and participated in additional fringe benefits worth about 40% of his salary.

According to the testimony, he spends an average of two days a week on the affairs of the company, and the balance of his time is devoted to the affairs of another company of which he is also president. The testimony also shows that extra time is on occasion put in by the president on Citizens' affairs, and we can reasonably find that half of his business hours are probably devoted to Citizens. However, even if he were to spend full time on the job, we believe his salary to be far out of line. When only about half time is devoted to Citizens, the salary becomes completely unrealistic. We again believe that the stockholders should bear the burden and not the electric consumers of Vermont. We therefore find, for the purposes of inclusion in the operating deduction of this case, that the sum of $20,000 as salary is reasonable for the president of a company such as Citizens who devotes but half his time to the business. This will result in a further reduction in the Mutual Service Account of $50,000, leaving a balance allowable to the various operations of the company, including Vermont, of $323,261."

Citizens has objected to this finding on the ground that it is an arbitrary disallowance of its chief executive's salary and not based upon evidence in the case, and is an intrusion into management of the company. The function of a public service commission is that of control and not of management, and regulation should not obtrude itself into the place of management. *Bacon* v. *Boston and M.R.R.*, 83 Vt. 421, 422, 76 Atl. 128.

This rule is recognized in all of our cases.

"This matter of salaries and advertising expenses calls for the exercise of judgment on the part of the management of the company. Good faith on its part is to be presumed." *Petition of New Eng. Tel. & Tel. Co.*, 115 Vt. 494, 510, 66 A.2d 135.

■ No evidence was before the Commission that the salary of Citizens' president was "out of line" with salaries paid presidents of similar utility companies in Vermont. Evidence before it was that officials of Citizens in positions of lesser responsibility than that of the presdent of the company received salaries in excess of the salary of $20,000 which the Commission found should be received by the president. There being no substantial evidence to support such finding, it cannot stand here. *Petition of Citizens Utilities Company*, 117 Vt. 285, 287, 91 A.2d 687. It should also be pointed out that by its finding, the Commission, possibly without so intending, did find as a fact what salary the president of Citizens should receive. This is a function of management. The authority of the Commission extended only over the

proportion of the salary amount that could properly be allowed as part of the allocable expenses in Citizens' Vermont operations.

Citizens has also excepted to the exclusion from the administration and general expense of Citizens' $62,135 of salaries before allocation of its Mutual Service Account expense items to the Newport Electric Division. Its Vermont utility operations are but one division of Citizens' widespread corporate activities which extend into many states and includes such different businesses as Alaskan fisheries and Arizonian water supplies. The headquarters and top management of Citizens is located at Stamford, Conn. The question before the Commission was the allocating to the Vermont utility operation its fair share of the general management expense.

The separation of legitimate administration expenses of the parent company in relation to the Newport Division from promotional and acquisition activities of the corporation, called for the exercise of sound and discriminating judgment on the part of the Public Service Board. Although Citizens, at the hearing, disputed the allocation made by the Public's accountant, the Commission reports that the company presented no substantial evidence to support its contention that the allocation was unjust. They have done no better in this appeal.

At most, Citizens contends the Vermont operation benefits by the expanding acquisition efforts of the main company by way of its ability to attract capital. This is at variance with some of its claims in connection with the cost of capital directed to the issue of rate of return. Citizens has failed to demonstrate that the allocation made by the Commission was in error or achieved an inequitable result. In the absence of such a showing we accord proper deference to the expert and informed judgment of the regulatory agency. *In re Central Vermont Public Service Corp.*, 116 Vt. 206, 209, 71 A.2d 576. No error appears.

The record establishes that Citizens initially set up a Mutual Service Account of $685,167. During the hearing $310,906 was eliminated from such account, without objection by Citizens, as having no relation to its Vermont operation. Admittedly, much of the time of the management people in the Stamford office was devoted to the acquisition of properties throughout the country, as well as to the study of other properties never acquired by the company. In the absence of evidence presented by Citizens on the percentage of time spent by personnel in such activities, or the cost of such activities properly allocable to Vermont, we are unable to sustain its objection to this finding of the Commission.

*Rate of Return.*

In the hearing before the Commission the testimony of Citizens' Vice-President and Treasurer was that a reasonable rate of return to the company would be between 6.8 and 7.6 on its rate base. The expert for the Public, Mr. Philip R. Friend, testified that a 6.25 rate of return would be fair. Both witnesses based their conclusion primarily on the cost of capital to Citizens. The Commission found 6.11 per cent to be reasonable and fair rate of return for the Newport Electric Division of Citizens.

Citizens has objected to such finding on the ground that such finding does not give Citizens a fair and reasonable rate of return, and that the finding of the Commission is without substantiating evidence.

"To adjudge whether a particular utility rate is just or reasonable involves decision on four underlying factors: 1. Gross earnings. 2. Operating expenses. 3. Rate base — the net value of the property upon which a return should be earned. 4. The rate of return." *Petition of New Eng. Tel. & Tel. Co.,* 120 Vt. 181, 190, 136 A.2d 357.

Because what we have previously said in this opinion requires a new determination by the Commission on two of the factors involved in the determination of a rate of return, viz., operating expenses and rate base, it necessarily follows that the Commission must also find a rate of return based upon such new determinations, and its present finding cannot stand.

However, because the same evidentiary question raised by Citizens may again be presented in a new hearing, we will consider it here.

In its consideration of the cost of debt to Citizens, the Commission set forth in its findings comparative costs of debt from companies described as "Vermont Private Utility" "A" and "Vermont Private Utility" "B" as compared with similar costs from Citizens Utilities Company. It followed the same plan in a comparison of debt ratios. The Commission stated that this was "information contained in the annual reports to this Board of several private utilities."

Citizens objects to the use of such information by the Commission on the ground that such information used by the Commission in setting the rate of return was not in evidence before it, and that neither Citizens nor the Public had the opportunity to meet, challenge or compare or explain such data with reference to the unidentified utilities' debt interest rates.

The Public, in support of the finding of the Commission, asserts that the Commission had the right to consider such information from its files as evidence because of a stipulation made between the parties prior to hearing.

Such assertion is made upon the following quotation from the record:

"Mr. Larrow: The understanding as I recall it, was that the parties agreed that the Board might take judicial notice of its own records, and of reports and other documents filed with it, pertinent to this matter, with the understanding that if counsel desires to direct the attention of the Board particularly to any one item, this would be done, if it were extensive, by furnishing reproductions of the matter, or in the case of a single item, I believe simply directing attention to that single item. Is that substantially it, Mr. Parker?"

Mr. Parker, counsel for Citizens, expressed his agreement.

■ It appears to us that the use of such comparative costs of debt to other Vermont utilities was justified by the stipulation just quoted. However, we suggest that the reference to the unidentified utilities should have been supported by proper testimony and exhibits.

Our order is, for reasons hereinbefore stated, *"the order of the Commission is reversed, and the cause remanded for a hearing in accordance with the views herein expressed."*