PETITION OF CENTRAL VERMONT PUBLIC SERVICE CORP.,
RE INCREASED RATES.

(71 A2d 576)

Special Term at Rutland, November, 1949.

Present: SHERBURNE, C. J., JEFFORDS, CLEARY, ADAMS and BLACKMER, JJ.

Opinion filed February 7, 1950.

*Lawrence & O'Brien* for the petitioner.

*Clifton G. Parker,* Attorney General, for the State of Vermont.

*Robert T. Stafford,* State's Attorney, Rutland County, for the State of Vermont.

*John A. Calhoun,* State's Attorney, Addison County, for the State of Vermont.

*Louis G. Whitcomb* and *Paul R. Teetor,* special counsel for the State of Vermont.

BLACKMER, J. The Central Vermont Public Service Corporation, petitioner, is a public utility corporation organized under the laws of this state, and engaged in the generation, transmission and distribution of electricity throughout a substantial area of Vermont, and to a limited extent in the states of New Hampshire and New York. On April 11, 1949 it brought its petition to the Vermont Public Service Commission requesting authority to revise its rate schedules by way of increase. Formal complaints of more than five persons adversely affected by the proposed rates having been received, it became mandatory for the Commission to investigate the justness and reasonableness of the rates proposed.

Public hearings were held, at which and thereafter the State of Vermont was represented by special counsel. Requests for findings were filed by the petitioner and the State; findings of fact denominated a "Report" were filed by the Commission; exceptions to the findings and failures to find as requested were taken by the petitioner; a judgment order and supplemental order were entered granting a part, but not all, of the increase desired; exceptions to the judgment were duly taken by the petitioner, a bill of exceptions filed, and the cause passed to this Court.

The original cost of the petitioner's utility plant in service was established by an order of the Federal Power Commission dated Jan. 5, 1943, Docket # I. T-5807. This cost was accepted in its considerations by the Vermont Commission, and such acceptance is not questioned by the petitioner.

In computing an appropriate rate base, the Commission employed a test year covering the twelve months period from May 1, 1948 to April 30, 1949. This interval covered the operating experience of the petitioner to the latest date for which data was then available. The rate base computed was the average net investment in utility plant for the test period selected. The Commission next made certain adjustments as to revenues and expenses to account for (1) a previous rate increase which became effective during the period, (2) a wage increase made during the same period, and (3) certain other adjustments to reflect changes which the Commission knew with reasonable certainty would be accomplished in the immediate future, including a reduction made in 1948

in the cost of electric current purchased from another electric utility.

The petitioner made calculations for the twelve months ending April 30, 1950, and insists that these calculations should control rather than the test year adopted by the Commission. This is the first matter for consideration.

█ An administrative agency performing the delegated legislative function of rate making has a broad discretion. Mr. Justice Cardozo, speaking for the United States Supreme Court, said of it: "Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law. Even in quasi judicial proceedings their informed and expert judgment exacts and receives a proper deference from courts when it has been reached with due submission to constitutional restraints. * * * * Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed." Ohio Bell Tel. Co. v. Public Utilities Commission of Ohio, 301 U S 292, 304, 57 S Ct 724, 730, 81 L Ed 1093, 1101. Such commissions are not bound to the service of any single formula or combination of formulas. Federal Power Commission v. Natural Gas Pipeline Co. 315 U S 575, 586, 62 S Ct 736, 743, 86 L Ed 1037, 1049-1050. In that case Mr. Chief Justice Stone said for the Court, "Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made, and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it, and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."

█ In selecting as its test year the most recent twelve months period for which data based on experience was available, the Commission reported: "It is our judgment that the propriety of the petitioner's proposed rate in relation to the present time and the immediate future can most reasonably be ascertained from a study of its operations during the most recent time for which data is available, with proper adjustments to show what results such operations would produce in the light of presently known factors relating to operating cost and revenues."

When it made this selection, the Commission acted in conformity with a view accepted by both Courts and Commissions in modern cases. *Panhandle Eastern Pipeline Co.* v. *Federal Power Commission,* 324 US 635, 65 S Ct 821, 89 L Ed 1241; *Detroit* v. *Panhandle Eastern Pipeline Co.,* 45 PURNS 203; *Re Salt Lake City Lines,* 78 PURNS 1; *Utah Public Service Commission* v. *Mountain Fuel Supply Co.,* 73 PURNS 428; *Re Cities Service Gas Co.,* 50 PURNS 65.

The following comments by commissions justify quotation. "But further estimates, no matter how reasonable, are not so reliable as the actual experience of the pattern year. It follows that we should base our determination of proper earnings on actual prevailing conditions, not forecasts." *Utah Public Service Commission* v. *Mountain Fuel Supply Co., supra.* "It seems clear to us that the immediate future can best be forecast on the basis of experience in the immediate past, particularly when the uncertainties in the economic situation are so numerous as at present." *Pennsylvania Public Utility Commission* v. *Equitable Gas Co.,* 61 PURNS 445. "Economic trends and cycles are too uncertain to permit an intelligent forecast on the basis of the evidence presented. The Commission therefore finds that for the purposes of this hearing the actual operating revenues of the company for the test period be used (with certain adjustments)." *Re Salt Lake City Lines, supra.*

It follows that the adoption of its test year method by the Commission was proper. There is no question, on the other hand, but that there is authority supporting in general the view taken by the petitioner. It is not to be assumed by those interested, nor by the legal profession, that the sanction of the method employed in this case commits the Vermont Public Service Commission to the same method in all future cases. Indeed, a rigid application thereof in all cases without considering "the pragmatic adjustments which may be called for by the particular circumstances" above referred to might, and probably would, eventually result in error.

What has been said disposes of much of the petitioner's briefing of this point, because where an administrative agency has authority to choose the criteria determinative of an issue of fact, it may reject evidence which has no materiality in view of the criteria adopted. *Panhandle Eastern Pipe Line Co.* v. *Federal*

*Power Commision,* 143 F2d 488. Some matters urged by petitioner remain for special mention.

The petitioner quotes from *Petition of New England Tel. & Tel. Co., Re Increased Rates,* 115 Vt 494, 499, 66 A2d 135, 139: "Moreover, it is clear that a year end figure for 1947 could not properly be considered as a rate base for average net investment in 1948, or thereafter", and translates it to mean "It is obviously wrong to ignore computations for the year ahead and supersede them by a computation for a year which has passed." An examination of the quoted statement in its context shows that the petitioner's interpretation is unwarranted. In that part of the opinion in which this sentence appears we had shown the necessity in a rate case for the determination of a proper rate base. We had also shown that the Commission had made no findings on this essential matter. We concluded this discussion with the above quoted sentence, an obiter statement. We were not therein stating any specific rule to be followed in determining a rate base, nor were we, as claimed by the petitioner, indicating that figures for the year ahead should prevail over those for the last preceding year. At the most, as a general statement, we meant that a year end figure, standing alone and without adjustments, cannot properly be used as a rate base, the amount of which is predicated on average net investment for the succeeding year, for a company whose rate base is constantly changing. The quoted statement is in no way inconsistent with the course adopted by the Commission, viz: The use of a test period based on the petitioner's most recent actual experience, adjusted for all known changes affecting operating costs and revenues in the immediate future.

There was introduced in evidence petitioner's exhibit 11-A, which set forth the estimated investment in utility plant and working capital, and a computation by petitioner of the cost of its capital and what it considered a necessary rate of return, all for the year ending April 30, 1950, and which it claims is correct. In the first place, these figures do not coincide with the theory on which the Commission proceeded, namely a test period ending April 30, 1949, and are to that extent irrelevant. In the second place, much of the material is supported by opinion evidence, as, looking to the future, it must necessarily be. Of it the Commission said "We cannot accept in full the financial requirements as defined by the petitioner." We find no fault in the Commission's statement. The

petitioner states that "it is obvious that they (the figures for the year ahead) should not be cast aside as of no weight whatsoever, as the Commission has done." We do not agree that the Commission did so, and point out that it merely failed to accept the petitioner's claims "in full". In fact, the record satisfies us that the Commission gave full and fair attention to all matters presented by the petitioner. Moreover, in its presentation of this part of the case, and elsewhere, the petitioner declines to recognize any approach to the problem of rate fixing, save its own, as sound. That view the Commission did not share, nor do we, for the reasons set forth above.

The State briefed a proposition to the effect that "The evidence in this case itself supports the Commission's preference for experience over speculation." The word "speculation" is not a particularly apt choice, since the worst that can be said of petitioner's evidence looking into the future is that it is opinion based on experience and business judgment. Be that as it may, this part of the State's brief and argument does not impress us, and we do not base our decision thereon. The petitioner has gone to some length in its reply brief to rebut these contentions. Since the claim of the State does not affect the result, it is needless to linger over the reply thereto.

In arriving at the average net investment in utility plant for the test period selected, the Commission excluded electric plant under construction. The petitioner insists that this item should be included, and this difference of opinion gives rise to the second question for decision.

These facts are found. The plant under construction, in all probability, will be in service during the period in which the rate established shall be in effect. The petitioner charged interest during the construction in the amount of $8996.04 during the test year. This interest is capitalized and included in the ultimate plant account. Therefore a double return would result if plant under construction were included in the rate base. Allowance of interest charged to construction fully and adequately compensates the petitioner for the use of capital invested in unfinished construction. The rate base contains allowance for capitalization of materials used in construction and inventories on hand before they were used in construction. In the employment of this test year basis no adjustment is made for the revenues which will be produced when

the plant under construction goes into service. The plant under construction will have substantial revenue-producing ability; nearly fifty per cent of such construction at the end of the test period (Apr. 30, 1949) relates to rural line extensions. It includes construction designed to replace existing plant not yet retired. Inclusion of plant under construction before the plant to be replaced is retired would obviously result in a double return.

In its brief the petitioner quite frankly admits that it charges interest on plant under construction and capitalizes such interest when the new construction is added to its plant account. The Commission has so found and that a double return would result from its inclusion. This is conclusive that plant under construction was correctly excluded from the rate base on the authority of *Petition of New England Tel. & Tel. Co., supra.* There it was said at pages 504 and 505 "But such property (under construction) should not be so included (in the rate base) if the inclusion would result in a double return to the company because interest upon the unfinished construction has been capitalized by the company."

The petitioner seeks to avoid the effect of the Commission's finding and ruling by arguing that its computation of cost of capital for the year ending April 30, 1950 deducted the item of interest charged to construction obviating the possibility of its receiving a double return. The argument has no force because it is addressed to a method of procedure not adopted by the Commission. It· is further· claimed, to the same end, that the petitioner deducted interest charged to construction "in its accounts and reports to the Commission", reference being made to its exhibit #4. This exhibit shows, under "Income Deductions" an item "Interest charged to construction-credit" in the sum of $7790.00. This is entirely consistent with petitioner's policy of charging and capitalizing interest on plant under construction. The entry to which our attention is directed is not a deduction from any capital account. It is an income item only, which reduces the amount of interest charged against income by the petitioner, thereby enlarging the amount of income available to the stockholders. Instead of contradicting the position of the Commission, it supports it.

In the employment of its test year basis, the Commission made no adjustment for the revenues which would be produced from the plant under construction when completed. Once it had been decided to eliminate plant under construction from the rate

base, the exclusion of revenues to be received therefrom automatically followed. Only so could it be determined whether the petitioner's earnings were adequate to provide a fair return on the property producing those earnings. Both property under construction and the estimated revenues therefrom must be included in the rate base, or neither. *Re King's County Lighting Co.,* 70 PURNS 374. Here the Commission included neither, which was proper. *Re Interstate Gas Co.,* 48 PURNS 267.

■ The Commission stated that "the inclusion of property under construction before the plant which it is designed to replace has actually been retired would obviously result in a double return." This is criticized on the ground that when replaced plant is retired, the petitioner's plant and depreciation reserves are reduced in like amount so that the amount of net plant is not changed by the retirement procedure. On the Commission's test year method, the answer is: While replacements are under construction the petitioner is compensated for the use of its capital by interest charged to construction. At the same time it is being compensated by a return on the property to be replaced. If, in addition, the property under construction were added to the rate base, thereby permitting it to produce yet another return over and above the two compensations already noted, the same property would produce two returns, or a double return, as the Commission aptly stated.

■ Another reason given by the Commission for the exclusion from the rate base of plant under construction was that "in the computation of the rate base, allowance is afforded the petitioner for capitalization of materials used in construction and inventories on hand before they were used in the process of construction." The objection thereto confuses the construction inventories mentioned with those materials and supplies which form a part of the working capital of the petitioner. See *Public Service Commission of Missouri* v. *St. Louis Gas Co.,* 49 PURNS 65. The Commission's position is supported by *Ohio Bell Tel. Co.* v. *Public Utilities Commission of Ohio,* 131 Ohio St 539, 3 NE 2nd 475, 493. No authority to the contrary is pointed out. The Commission's position is approved.

Petitioner comments in passing, so to speak, that in figuring the cost of capital, the Commission did not deduct interest during construction from total interest payments made by petitioner during the test year. It should not have been deducted, for such interest.

later capitalized, is in the nature of interest received by the petitioner, not interest paid by it. Had interest during construction been deducted from total interest paid it would have been a detriment to the petitioner. The greater the interest paid, the greater the cost of capital.

It is said by the petitioner that there is no evidence to show the amount of interest charged to construction particularly applicable to investment in electric plant under construction either at December 31, 1948 or at April 30, 1949, and no evidence to show at what rate such interest was charged and capitalized. The petitioner reasons therefrom that there is no basis for the Commission's conclusion that "Allowance of interest charged to construction fully and adequately compensates the petitioner for the use of capital invested in unfinished construction." But this does not follow. The evidence discloses $7790 interest charged to construction in the calendar year 1948 and $8996 in the year ending April 30, 1949. This is, on its face, reasonable, and no effort was made by the petitioner to demonstrate that the rate it charged itself was too low. We agree with the State that the Commission was justified in drawing the inference that petitioner's management would not undercharge itself in this particular.

■ "The issue here presented (i.e. inclusion or exclusion of property under construction) is essentially one of fact for the Commission's determination." *Petition of New England Tel. & Tel. Co., supra,* at 505. The Commission has found for exclusion, and no error appears.

■ Third is petitioner's contention that extensions and betterments (future additions to plant) to be begun, completed and put in service during the year ending April 30, 1950 should be included in the rate base. If the Commission had adopted a test year period coinciding with that noted, and if the estimated revenues to be produced from such future additions had also been included as the balancing factor, there would be merit to the contention. But with the selection of a test year ending April 30, 1949, these items were not germane. The inclusion of non-existent plant as part of a rate base predicated upon most recent past experience would clearly destroy the validity of the test by making the petitioner's earning power appear lower than it actually was. Nor is the exclusion unfair to the petitioner. Additions to plant are primarily designed to meet increased demand. The increased revenues from

this future business should compensate the petitioner for such future additions to plant. *Re Interstate Gas Co., supra.*

Several cases from other Commissions are cited as authority for inclusion of future additions to plant. In so far as they are applicable to the situation in hand, we decline to endorse them. We say that when such future plant goes into service, the petitioner will receive a fair return thereon under the rates established by the method which the Commission has employed, and through the media of increased revenue and decreased costs of operation. *Re Interstate Gas Co., supra.*

The rate of return allowed by the Commission was 5.65 per cent on a rate base of $16,898,062. This result is challenged by many exceptions, which collectively pose the question of whether such rate is just and reasonable. This presents the fourth matter for disposition.

The rule governing a proper rate of return for a public utility has been announced recently by this Court. The fixing of just and reasonable rates involves a balancing of the investor and consumer interests. From the standpoint of the investor it is required that there be enough revenue for capital costs of the business, including service on the debt and dividends on the stock. The return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. The return should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. From the investor point of view a reasonable return should also provide for something to be passed to the surplus account. However, a fair return to investors is not necessarily fair to consumers. Regulation does not insure that the business shall produce net revenues. *Petition of New England Tel. & Tel. Co., supra,* 512-513.

The Commission has found that the return designated is just and reasonable. It states that it has sought to achieve an equitable balance of consumer and investor interests. It was its objective "to provide that rate of return which is adjusted to the needs of the utility consistent with the public interest." It has specifically found that the petitioner desires too much in these words: "This standard (above quoted) dictates that we cannot accept in full the financial requirements as defined by the petitioner." These following facts further appear from the report. A revenue in ex-

cess of the actual cost of capital is required to maintain the financial integrity of the petitioner, and to place it in a position to successfully compete in the money markets for additional capital. A properly balanced capital structure is in the public interest. A 5.65 per cent rate of return will afford the petitioner ample ability to attract new capital, and will enable it to successfully compete for such new capital either in the form of debt or equity securities as may be most expedient. The petitioner has maintained a relatively low earnings price ratio on its common stock. The financial structure of the petitioner has been considered. The relationship of its long term debt to its total capitalization compares favorably with Class A and Class B operating electric utilities. Financial and general economic conditions of the present and the immediately predictable future have been considered, and an effort made to indulge in proper forecasts of probable future values. Petitioner's labor costs are stabilized. Cost of materials has been relatively stable or descending. Heavy post-war II plant expansion has occured in the construction of new distribution facilities. Such new plant has not reached its maximum of revenue producing ability; the petitioner's president anticipates it will continue to grow very rapidly. Its growth depends in some measure on the reasonableness and adequacy of the rates permitted to prevail. The return specified is commensurate with returns on investments in other enterprises having corresponding risks, consistent with the petitioner's financial integrity, and affording it the ability to maintain its credit and attract new capital.

It is manifest that the Commission made a thoughtful and comprehensive effort to arrive at a proper result. We should be, and are, reluctant to interfere with its expert and informed judgment. *Ohio Bell Tel. Co.* v. *Public Utilities Commission of Ohio, supra,* 301 U.S. 292, 57 S Ct 724, 81 L Ed at page 1101.

The principal criticism made by the petitioner is that the rate allowed is not sufficient to support and attract common stock capital. It lays great stress on a claim that it must be able to maintain the present 68¢ per year dividend on its common stock from seventy per cent of its net earnings after taxes, retaining thirty per cent for transfer to surplus. It says that the rate established by the Commission is inadequate, in that it will require eighty per cent of its net earnings to support the dividend currently paid.

Of course this element is an important one in fixing the rate

of return. However, it is but one of many components for consideration by and considered by the Commission, as above noted, and it is one in which the interest of the petitioner is greater than that of the public as consumer.

There is evidence in the record supporting the finding of the Commission, with particular reference to the objection now being considered. We summarize the greater part of it herewith. The average pay-out of twenty representative utilities is 78.1%. Pay-out varies from 60% to 90% and more, although it usually does not go for any extended period over 80%. The petitioner's president testified that the figure of 70% striven for was a "judgment figure" on his part. The petitioner has maintained a relatively low earnings price ratio on its common stock, and this in spite of the adverse market circumstances introduced by the impact of a flood disaster upon it. After payment of the current dividend there will be $102,180 available for surplus. The earnings of the company are growing and expected to so continue. After interest and dividends on preferred stock the return on the common will be 8.07%. The earnings-price ratio of typical electric operating utilities was 7.7% in 1948; the average for petitioner for the period January 1946 to June 1949 was 7.8%. A common stock dividend of 68¢ represents a yield of 6.4% on petitioner's combined capital stock and surplus, against a yield of 5.9% for twenty typical electric operating utilities. If the petitioner sold common stock at $8.65 per share (which it says it desires to do) the earnings-offering price ratio would be 9.7% on the Commission's rate. In 1948 the average earnings-offering price ratio for 21 offerings of common stock of utilities in quantity was 10%.

It is uncontrovertible that there is much evidence and argument which would sanction a different result. It is needless to detail it. The Commission was under no obligation to accept it, and the Commission did not. The evidence supports the result reached in the particular in which it is challenged. *Sabre et al.* v. *Rutland R. R. Co. et al.*, 86 Vt 347, 386, 85 A 693, Ann Cas 1915C 1269. The pertinent exceptions concerning rate of return allowed are dismissed.

In the same connection, the petitioner makes a mention that in calculating the cost of capital for its test year the Commission omitted interest on $400,000 of temporary borrowings. We are not shown how this came about, if it did, nor are we directed to

any evidence tending to show the amount of interest claimed to have been omitted. The State assures us that it has made due search, and cannot find any evidence introduced by the petitioner of the amount of interest on temporary borrowings. In this circumstance we are under no duty to make an independent search; we therefore accept the State's word for it. Error does not appear.

Fifth, and last, are exceptions taken by the petitioner to the following findings in the report under the heading "Flood Losses."

"As a result of the excessive demands on the capital structure of the petitioner and the excessive and burdensome charges to surplus account, the capital structure of the petitioner was substantially impaired.

"We regard these facts as proper matter for our consideration in determining the fair rate of return."

Petitioner's counsel stated in argument that this matter is of relatively minor importance, and in that statement we concur.

It cannot be seriously questioned that the findings in the first quoted paragraph are correct. The petitioner's annual report for the year ended December 31, 1948 shows charges to "Flood Costs and Contingencies" in the sum of $1,705,066.66. Against this was credited $624,000 estimated tax reductions, leaving a balance of $1,081,066.66. The common stock was reduced by ten per cent, and the amount of $419,707.60 arising therefrom was transferred to capital surplus. The $1,081,066.66 was charged to earned surplus, creating an earned surplus deficit of $236,947.37, which in turn was eliminated by a charge to capital surplus. The expense of capital stock retirement, $4,979.61, and a preferred stock dividend of $78,361.92 were also charged to capital surplus. The petitioner's own figures fully warrant the Commission's finding. Nor is the finding vitiated because after the flood the petitioner sold 326,700 shares of stock at $8.25 per share for a total of $2,695,275 by way of recoupment of its capital position. In fact, the flood necessitated what the petitioner itself refers to as a "quasi-reorganization" of its corporate capital structure.

The petitioner says that the facts found should not have been considered at all, and fears that such consideration resulted in a reduced return concealed behind an equivocal general statement. The consideration given is shown by the Commission's statement in connection with the ultimate finding on rate of return: "the petitioner has maintained a relatively low earnings-price ratio on its

common stock in spite of the adverse market circumstances introduced by the impact of the flood disaster." Surely this use was legitimate, and no other use appears. The petitioner points out no way in which it has been improperly affected by the consideration which it supposes. The result reached, the return fixed, is consistent with a limitation of use to that quoted. The Commission patently was aware that it "was required to report fully upon all the substantial issues raised by the material evidence in the case," *Petition of New England Tel. & Tel. Co., supra,* 501, and it discharged that requirement. It standing thus, we will not conjecture that the Commission concealed anything behind anything, particularly in the face of the presumption that it did its duty.

In its discussion of the subject matter just finished with, the petitioner stresses the magnitude of the loss occasioned its stockholders by reason of flood damage, and we, too, are impressed with the seriousness of their deprivation. Although it does not affect the decision in the instant case, we take the occasion offered by the petitioner's argument to remark, as a guidepost for the future, that the risk of economic catastrophe rests on the owners of a regulated as well as an unregulated business, and that the public, as consumers, cannot reasonably be expected to reimburse the stockholders of a regulated enterprise for losses occasioned thereby. Such losses do not fall within the most satisfactory definition of depreciation for which allowance is to be made in fixing the rate base for a public utility, namely: The loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property, embracing wear and tear, decay, inadequacy and obsolescence. *Lindheimer* v. *Illinois Bell Tel. Co.,* 292 U S 151, 54 S Ct 658, 78 L Ed 1182; 43 Am. Jur., Public Utilities and Services, Sec. 145, p. 669.

In this, as in every rate case, there is left a reasonable margin of fluctuation and uncertainty. *Dayton Power & Light Co.* v. *Public Utilities Commission of Ohio,* 292 U S 290, 310, 54 S Ct 647, 78 L Ed 1267, 1281. But over a period of years fluctuations tend to offset and equalize each other. Neither management nor regulatory commissions possess the foresight to fix a rate structure which will yield with precision and exactness a given rate of return for any future period of time. *Southern Bell Tel. & Tel. Co.,* 76 PURNS 33. A rate of return may be reasonable at one time and become too high or too low by changes affecting oppor-

tunities for investment, the money market, and business conditions generally. *Bluefield Water Works and Improvement Co.* v. *Public Service Commission of the State of West Virginia,* 262 U S 679, 43 S Ct 675, 67 L Ed 1176, 1183. This is not an order for all time. If in the light of experience the rates turn out to be inadequate, the doors of the Commission are open for increased al-·lowances. V. S. 9375-9376, Rev. 1947; *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U S 591, 615, 64 S Ct 281, 88 L Ed 333, 352. Conversely, if the rates prove overly generous, a remedy is provided by V. S. 9365-9368, Rev. 1947.

Each and every question briefed has been deliberated and decided. The Commission's decision is deemed sound in law.

*The order of the Public Service Commission dated August 5, 1949 and its supplemental order dated September 2, 1949 are affirmed. To be certified to the Public Service Commission.*