# Petition of New England Tel. & Tel. Co., Re Increased Rates

[136 A2d 357]

September Term, 1957

Opinion Filed November 5, 1957.

*John D. Carbine* and *Frank A. Hutson* (of Boston, Mass.) for the petitioner.

*Arthur L. Graves* for the Public.

**Holden, J.** The subject of this appeal is the petition of the New England Telephone Company to increase local telephone exchange and service charges above the rate schedule established by the Public Service Commission in December, 1953.

The increase proposed was filed February 2, 1956, with the objective of procuring additional annual revenues of

$253,000. The rates requested were suspended by the Commission until August 29, 1956. At that time, the new rates went into effect and have been collected under a refunding bond as provided by V. S. 47, §9376, as amended. After a prehearing conference, and formal hearings that ended October 26, 1956, the Commission on February 26, 1957, disapproved the rates filed. Refund of revenues collected in excess of those permitted by its Vermont tariff in effect prior to the filing of February 2, 1956, was ordered.

The Company assigns error to the failure of the Commission to allow certain adjustments claimed for wage increases and amortization of extraordinary expenses incurred in prior years. Beyond that, the appellant contends the final order of the Commission resulted in a denial to the Company of its constitutional right to a fair hearing.

In the presentation of its cause, the Company selected 1955 as the proper test year for the Commission's examination of its operating expenses, revenues and net earnings.

By its report and specific findings, the Commission ruled in the Company's favor on all disputed points concerning the recorded test year results.

█ The employment of a test period based on the utility's most recent actual experience required proper adjustment for all known changes affecting operating costs and revenues in the immediate future. *Petition of Central Vermont Public Service Corp.*, 116 Vt 206, 211, 71 A2d 576.

The Company offered four such adjustments.

The first adjustment results from the change introduced in the method of separating plant expenses and revenues between interstate and intrastate operations. The Company based its separation studies on the uniform method of separations prescribed by the joint efforts of the National Association of Railroad and Utilities Commissioners and the Federal Communications Commission, referred to as the Modified Phoenix Plan, effective in July 1956. The application of this procedure produces results favorable to intrastate earnings. There is no dispute that such adjustment should be made for this change, in fixing rates for the future. The Company

and State differed on the data to be used. The Commission adopted the position advanced by the Company.

The second adjustment submitted related to an increase in coin telephone rates which took effect during 1955. Adjusted to the full year, these revenues would have increased net earnings by $11,370. While the Commission reported it was mindful the coin rate increase would augment future net telephone earnings, it omitted this adjustment in its final calculation of net earnings. This omission worked to the Company's advantage.

■ The Commission, in substance, approved the first two adjustments and rejected the third and fourth. The Company asserts there is basic unfairness in adopting adjustments favorable to a higher return and rejecting factors which tended to decrease the rate of return. This, of course, cannot be the proper critierion for adjudging error. The particular adjustment suggested must stand or fall on its own merit.

The third adjustment relied upon by the Company is founded on a general wage increase granted by the Company to its non-management employees during the final quarter of 1955. The Company's claim for the overall effect of this wage increase was rejected.

The related findings indicate the Commission rejected the Company's computation for the reason it was inappropriately applied to wages for employees whose services were no longer required. It included employment expense, both traffic and maintenance, that was eliminated upon the conversion of manually operated exchanges to automatic dial operation during 1955. It thereby had the effect of imposing the wage increase to operating expense that would not recur.

The findings indicate that the Commisssion did not fail to recognize the wage increase in 1955. It denied that the wage increase, measured in the light of reduced operating expense accomplished by dial conversion, would cause net telephone earnings to suffer.

By the wage adjustment proposed, the Company claims net intrastate telephone earnings for the test year should be reduced by $62,239. However, the experienced results during

the period since the wage increase has been in effect do not confirm the correctness of this estimate. The seven month period, October 1955 through April 1956, during which the burden of the wage increase had been applied without rate relief, produced higher net intrastate operating income than the corresponding seven month period of 1954-1955. There was a related increase in the recorded per cent of net intrastate operating income to average net intrastate telephone plant in service when applied to the same periods.

██ Error is not made to appear from the Commission's refusal to accept the estimates of reduced earnings by reason of the wage increase, when favorable experience demonstrated a contrary effect. "Actual experience of the Company is more convincing that tabulation of estimates. * * * Elaborate calculations which are at war with realities are of no avail." *Lindheimer* v. *Illinois Bell Telephone Co.*, 292 US 151, 164, 54 S Ct 658, 663, 78 L Ed 1182. A forecast is not legally preferable to a survey, even though the survey was, of necessity, limited to a relatively short period. *West Ohio Gas Co.* v. *Public Utilities Commission*, 294 US 79, 82, 55 S Ct 324, 79 L Ed 773; *Petition of New England Telephone and Telegraph Co.*, 116 Vt 480, 513, 80 A2d 671.

There is support in the evidence for the ultimate finding by the Commission "that while there have been wage scale adjustments and increased taxes and other expenses, the Company's increased revenues have more than offset those adjustments and expenses."

The record and the findings refute the contention of the appellant that the Commission, without reason, arbitrarily rejected the adjustment proposed.

This was a decision which the regulatory agency was entitled to reach on the facts presented within the confines of their statutory authority. *Federal Power Commission* v. *Natural Gas Pipeline Co.*, 315 US 575, 586, 62 S Ct 736, 86 L Ed 1037; *Petition of Central Vermont Public Service Corp.*, *supra*, 116 Vt at 209, 71 A2d at 578.

The fourth adjustment sought by the Company to the 1955 recorded results arises from the previous order of the Commission in 1953.

That order fixing the present rate schedule was predicated on the operating results of the year 1952 with certain adjustments. The record discloses that in 1952 the Company experienced certain extraordinary and non-recurring expenses that were incurred by casualty damage, costs of transfer of its Vermont accounting office from Massachusetts to Vermont, and litigation expense for the rate proceedings, in the total amount of $310,573.

In this proceeding the Company claims the 1955 recorded operating expenses should be adjusted by adding $195,928. This claim includes extraordinary expense incurred by the Company which reaches back to cover the period 1948 through 1955. The sum of $195,928 represents one-fifth of the total extraordinary expense incident to casualty damage, removal of accounting office and rate case expense over the entire period. Had this claim been allowed it would have produced the unjust effect of imposing the burden of costs incurred in 1948 on telephone users in 1956 and thereafter. The record does not show that the Commission, in 1953, gathered the aggregate of these expenses from 1948 and thereby cast them on the future.

The Company's Accounting Manager for Vermont testified: "The Commission, in determining the revenues to which the Company was entitled, did not allow the Company all of its actual incurred expenses, but used one-fifth of the expenses for casualty damage, the establishment of the accounting office and the rate case expenses. The Commission in effect postponed recovery of these expenses to a future period."

One-fifth of such expense incurred in 1952 was $62,115. The remaining four-fifths of this expense was thereby allocated for collection from revenues under the schedule then approved in the years 1953 through 1956. The amortization of the $310,573 incurred in 1952 would be satisfied by the end of 1956.

■ Since the period of the postponement includes the year 1956, and the rates here involved apply to a substantial portion of the year 1956, the Commission in its ultimate conclusion should have compensated for that part of the amortization which looked to 1956 for satisfaction.

The assignment of one-fifth of the expense incurred in 1952 for casualty damage, accounting office removal and rate case expense to the test year would increase operating expenses by $62,115. By mathematical computation, including the effect of federal income tax requirements, this amortization requirement would have reduced the net operating revenues by $29,815.

The net result would be a reduction in the net intrastate telephone earnings, found by the Commission at $1,042,202, to $1,012,387 on the rate base proposed by the Company. The adjusted net earnings develop a rate of return of 5.5%.

Claiming full credit and validity for each adjustment proposed, the Company contends that the rate increase here requested will produce net telephone earnings of only $1,009,544 to yield a return of 5.46%, on the adjusted 1955 experience.

The crucial and controlling question of the net telephone earnings needed to satisfy the requirements of a "fair and just" return has gone unanswered in the record of the proceedings underlying this review.

The absence of this vital factor from the proof unfolds the most important question for decision.

The error claimed stands on the contention of the appellant Company that there was an agreement and understanding that the filed rates were to be allowed so long as the rate of return did not exceed 6%. The Company contends the understanding developed from agreement by counsel representing the public at the pre-hearing conference of May 15, 1956, and from the theory upon which the case was tried.

The understanding and the theory of the case claimed in the appellant's brief are recited to be:

"1. Rate of return was not to be an issue in this case and it was unnecessary to introduce evidence in regard thereto because

2. The Commission's determination in prior cases that the Company was entitled to earn up to six percent on its Vermont intrastate operations was to control in this case."

188

The Company advocates that by the final disapproval of the rate schedule proposed the Commission departed from the understanding previously reached. The appellant charges this departure unconstitutionally deprived the petitioner of a fair hearing on the issue of the rate of return justified by its Vermont intrastate operations.

The essentials of due process permit administrative regulation only by adherence to the fundamental principles of constitutional government. The legislature must appropriately prescribe standards of administrative action. The quasi-judicial action thus prescribed, must faithfully observe the "rudiments of fair play." A fair and open hearing is the absolute demand of all judicial inquiry. In the field of administrative regulation it is not only vital to the validity of the regulation imposed; it is vital "to the maintenance of public confidence in the value and soundness of this important governmental process." *Morgan* v. *United States*, 304 US 1, 14, 15, 58 S Ct 773, 775, 82 L Ed 1129; *Ohio Bell Telephone Co.* v. *Public Utilities Commission*, 301 US 292, 304, 305, 57 S Ct 724, 81 L Ed 1093; *Sabre* v. *Rutland Railroad Co.*, 86 Vt 355, 369, 85 A 693.

In accord with the provisions of No. 223 of the Acts of 1953, the issues presented by the petition for increased rates were considered in conference preliminary to the formal hearing.

At the outset of the conference, after stating the background giving rise to the rate increase requested, counsel for the Company submitted in writing a "Proposed Limitation of Issues." This writing proposed the elimination of ten factors. The proposal embraced controversial issues that had pervaded and complicated earlier rate proceedings. It included the settlement of the constituents of the rate base, separation of interstate and intrastate operations, depreciation, operating expense allowable under the American Telephone and Telegraph Company license contract, Western Electric prices and the rate of return. By its written terms, acceptance of any single proposal was not limited or conditioned upon the acceptance of any other.

Full accord was reached on six of the proposals. Substantial agreement was reached on three of the remaining four. Such variance as existed as to nine of the proposals is not material to the question here presented.

The remaining and critical issue sought to be limited was set forth in numbered paragraph 6, "That the petitioner is entitled to earn at least 6% on its net investment as computed by the Commission, excluding property under construction, property held for future use and with a limited allowance for working capital."

To this offer, counsel for the Public replied: "Now No. 6, I will say this, it is a surprise to me for this reason. I had information that the company said to the Commission that it was not the purpose of this rate filing to enable the company as much as 6% on its Vermont net investment as computed by the Commission. I may have misunderstood. I would like very much to see this issue of rate of return eliminated. It takes a very great deal of time, takes very expensive experts. **** if the Company will tell the Commission and me what they are really asking for on rate of return perhaps I can agree to that, not agreeing they are entitled to at least 6% because I don't believe they are. That is all I have to say here."

Search of the transcript reveals no further comment on the subject of rate of return on the part of counsel for the Public. Following a short recess, counsel for the Company pursued the subject briefly by this statement in the record: "Going on to No. 6, I want to clear the matter up a little bit. This filing is designed to produce a rate of return of less than 6% as appears on our filing, the rate of return is established as reasonable as we understand it and we do not intend to produce any rate of return testimony as we deem it unnecessary under the previous ruling of the Commission in which the return is written as under 6%. Our filing is not designed to produce 6% but is designed to produce less than 6%. I don't think we need any ruling on that, just wanted to qualify our position on that." Neither counsel for the Public, nor the Commission, made any response to this statement. By the context, none was called for. This statement concluded the

discussion of the issue relating to rate of return at the prehearing conference.

The members of the Public Service Commission in no way entered upon the discussion of proposal 6 at the conference. No prehearing order was entered. In its report, filed with the findings of fact, the Commission recited the issues upon which counsel were basically in accord at the pretrial conference. The subject of rate of return is not there mentioned.

The verbatim record refutes the Company's claim that there was an understanding between counsel that the proposed increase was to be granted if the rate of return did not exceed 6 percent.

Further, the understanding relied upon by the Company is inconsistent with the procedure prescribed by No. 223 of the Acts of 1953. It is there provided that a utility seeking an increase in rates shall file with the Public Service Commission copies of all exhibits relied upon to support the increase, prior to the prehearing conference required in all contested rate cases. At such conference the Commission "may require the state or any person opposing such rate increase to specify what items shown by the filed exhibits are conceded. Further proof of conceded items shall not be required."

■ It is clear from the wording of the act, the legislature did not contemplate the unrestrained elimination of critical and controlling issues without supporting proof. This statute does not commit the outcome of contested rate litigation to the agreement of counsel. It is not until the issue sought to be eliminated is supported by an underlying exhibit, whose correctness and propriety has been conceded, that the need for additional supporting proof is obviated.

■ To adjudge whether a particular utility rate is just or reasonable involves decision on four underlying factors: 1. Gross earnings. 2. Operating expenses. 3. Rate base —the net value of the property upon which a return should be earned. 4. The rate of return. See *Missouri ex rel Southwestern Bell Telephone Company* v. *Public Service Commission*, 262 US 276, 291, 43 S Ct 544, 547, 67 L Ed 981 (concurring

opinion Brandeis and Holmes, JJ.); *Petition of New England Telephone and Telegraph Co.*, 115 Vt 494, 498, 66 A2d 135.

In the prehearing conference, counsel sought to resolve two of the critical issues, rate base and rate of return. Resolution of the issues concerning revenues and operating expenses was left to examination of results obtained in 1955 as a test year.

The agreement on the rate base was accomplished with reservation concerning separations data, finally resolved in the Company's favor. It is supported by exhibits subsequently introduced to reflect Telephone Plant in Service-Primary Account Detail, with related exhibits concerning depreciation rates and basic separations procedure agreed upon.

The determinant issue of rate of return is left unanswered by oral proof or exhibit.

 The fundamental considerations required in finding a fair return are set forth in *Bluefield Water Works and Improvement Co. v. Public Service Commission*, 262 US 679 at 692, 43 S Ct 675, 679, 67 L Ed 1176. "A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainites; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time, and become too high or too low by changes affecting opportunities for investment, the money market, and business conditions generally." The principles enunciated in the *Bluefield* case have been consistently confirmed and followed in many cases, in many jurisdictions, including Vermont. *Petition of New England Telephone and*

*Telegraph Co.*, *supra*, 115 Vt at 512, 80 A2d at 690; *Petition of Central Vermont Public Service Corp.*, *supra*, 116 Vt 206 at 216, 71 A2d 576 at 582.

■ The costs of capital bear an importance equal to operating expenses, taxes and depreciation. Each forms a part of the current cost of supplying the service. Each must be satisfied from current income. "When the financing has been proper, the cost to the utility of the capital required to construct, equip and operate its plant should measure the rate of return which the Constitution guarantees opportunity to earn." *Missouri ex rel Southwestern Bell Telephone Co.*, *supra*, 262 US at 306, 43 S Ct at 552 (concurring opinion).

This vital ingredient to Company's cause was neglected and abandoned without reason, in fact or law, upon the unsound premise that such proof was "unnecessary under previous rulings of the Commission."

No concurrence with this view was expressed by either counsel for the Public or by the Commission. The result that the hearing followed this announced design came about from no agreement or understanding reached with opposing counsel or the Commission. It came about at the Company's independent election.

■ Without supporting evidence, the Commission was not at liberty to resort to the 1953 rate proceedings in determining a just and reasonable return in 1956. The justness of the return allowed must be based on present requirements. A fair return at one time may become unfair and unreasonable at a later time. *Petition of New England Telephone and Telegraph Co.*, *supra*, 115 Vt at 507, 80 A2d at 687.

With the record naked of affirmative proof on the issues of the requirments of a fair return, the Company, with considerable inconsistency, claims error in the final order appealed from for the reason "there is no finding as to what is a fair return from the petitioner's Vermont operation." It is true the Commission found the rate schedule operating without the increase requested produced a rate of return of 5.6%. There is no finding that this rate constitutes a fair return. None could be, from the evidence submitted.

■ This was the legal consequence of the deficiency in the evidence. The proof does not disclose what net earnings are required of the Vermont intrastate operation to support its proportionate share of the Company's capital structure. Lacking this essential factor, the record did not afford the Commission any legal foundation for adjudicating either the fairness of the return produced by the existing rate schedule or its proposed amendment. Without substantial footing in the evidence presented, any finding on the subject, whether favorable to the Company or otherwise, would have constituted error. *Newport* v. *Citizen's Utility Co.*, 116 Vt 103, 105, 107, 70 A2d 590; *In re New England Power Corp.*, 103 Vt 453, 459, 156 A 390.

■ Reversal should not result for want of a material finding for which there is no support in the evidence. *Shaw* v. *Shaw*, 99 Vt 356, 358, 133 A 248.

The Commission did not decline to consider a fact well proved. It declined to find a fact unproved.

In so doing, the Commission did not pursue procedure condemned by this Court in *Sabre* v. *Rutland Railroad Co.*, *supra*, 86 Vt at 354, 355, 85 A at 696; and by the United States Supreme Court, in *West Ohio Gas Co.* v. *Public Utilities Commission*, 294 US 63, 68, 55 S Ct 316, 79 L Ed 761; *Ohio Bell Telephone Co.* v. *Public Utilities Commission*, *supra*, 301 US 292, 300, 57 S Ct 724, 81 L Ed 1093, by unlawful resort to facts outside the record to overthrow facts lawfully established in regular hearing. The Commission did not secretly revoke a lawful order, openly achieved, to accomplish a different result, without notice or hearing, as in *Thompson* v. *Smith*, 119 Vt 488, 507, 508, 129 A2d 638.

The Company was not foreclosed from offering evidence on the issue of the rate of return justified by its Vermont intrastate investment. The intendants of its cause saw fit to decline the opportunity to be heard on the subject for the avowed reason such proof was regarded as not necessary to the relief requested.

The final order was not the result of a disregard of the essentials of due process. It was the result of a failure of proof.

The Company relies on *Pan American Airways* v. *Civil Aeronautics Board*, 84 US App DC, 171 F2d 139, 142. There the regulatory agency departed from the rate of return proposed as fair by the agency itself as a result of pretrial conference. The Board stated the issues to be tried. It expressly omitted the issue of rate of return. In this case no specified rate was fixed. A ceiling was suggested. There was no action or statement by the Commission from which it might be inferred that the administrative agency acquiesced in the bilateral proposal by the Company that (1) the issue of rate of return was eliminated, and (2) the filed rates were to be allowed as a matter of course, if they produced a return of less than 6%.

The effect of the acquiescence claimed would have constituted a ruling, before hearing, that the Company was entitled to some $187,074 in net earnings above and beyond those requested. Neither the facts nor the theory upon which the case was tried permit of such an understanding.

The recorded results of the 1955 test year, properly adjusted for known changes of the immediate future, including correct compensation for amortized extraordinary expense in 1952, produces a 5.5% rate of return. The results of the first four months of 1956, bearing full impact of the wage increase accomplished in 1955, produced a return, on an annualized basis, of 5.5%. The Company's Vermont General Manager and its Chief Accountant expected it to remain at that level.

Whether or not the Commission improperly resorted to the comparison of the results produced by Vermont intrastate operations on the 1953 rate schedule to interstate and company-wide results for the same period is immaterial. If erroneously done, the error was harmless. The comparison, however considered, could not supply the manifest shortage in the proof on the justness of either the intrastate return achieved or the interstate return with which it was compared.

Without affirmative proof that 5.5% was inadequate to meet the Company's current capital demands, there was no justification in law to grant the rate relief requested.

*Exceptions overruled. Cause remanded to the Public Service Commission for further proceedings consistent with the opinion. The refunding bond filed by the Petitioner, August 29, 1956 is ordered to remain in full force and effect until the Public Service Commission determines that the conditions of the bond have been satisfied.*