## In re Petition of Vermont Electric Cooperative, Inc. Requesting an Increase in Rates

[451 A.2d 1110]

No. 452-81

Present: Barney, C.J., Billings, Hill and Underwood, JJ., and Daley, J. (Ret.), Specially Assigned

Opinion Filed September 7, 1982

596

*William B. Piper* and *Marc B. Heath* of *Downs Rachlin &
Martin,* St. Johnsbury, for Petitioner-Appellant.

*Gerald R. Tarrant, Michael L. Burak,* and *Peter H. Zamore,*
Montpelier, for Respondent-Appellee.

**Underwood, J.** The Vermont Electric Cooperative (VEC)
appeals the size of a recoupment award granted it by the
Public Service Board (Board). This proceeding was initiated
when VEC petitioned for Board approval of a 12.6 per cent
increase in rates, which would have produced an additional
$665,821 in operating revenues for the test year ending
April 30, 1980. This proposed rate increase was to become
effective on July 1, 1980.

The Board, acting pursuant to 30 V.S.A. § 227(a), sus-
pended the proposed rate increase on June 24, 1980, pending
a final decision on VEC's request. When the Board did not

reach a final decision within six months, VEC put its proposed rate increase into effect on January 1, 1981, after filing a bond with the Board to secure repayment in the event the Board eventually found the rates charged were too high. 30 V.S.A. § 227(a).

The Board, in an order dated April 30, 1981, reached a final decision on the proposed rate increases, awarding only a 7.8 per cent increase in rates which produced only $411,989 in additional operating revenues for the test year ending April 30, 1980. VEC does not appeal this order. Rather, it appeals the Board's subsequent order limiting VEC's recoupment to $185,686, for the period between July 1, 1980, the date originally proposed for introduction of the higher rates, and December 31, 1980, the day before VEC introduced the rate increases under bond. VEC does not dispute the amount of money it must refund to its customers because the rates introduced on January 1, 1981, exceeded those ultimately approved. 30 V.S.A. § 226(a).

VEC argues that the method used by the Board to calculate the amount of recoupment it could collect for the six months during which its rate increases were suspended violated 30 V.S.A. § 226(b), which provides:

> If the board orders that the changed rate shall not go into effect until final determination of the proceedings, and if, upon final disposition of the issues involved in such proceeding, the rates as finally determined are in excess of the rates in force at the time such changes are filed, then such public service company shall be permitted to amortize and recover, under the direction of the board, by means of a temporary increase over and above the rates finally determined, *such sum as shall represent the difference between the net operating earnings obtained from the rates in force at the time such changes are filed and the net operating earnings which would have been obtained under the rates finally determined if applied during the period such suspension order was in effect based upon the same volume of business,* or such portion of the difference as may be just and reasonable, in the judgment of the board, in view of economic changes

which may have occurred since the filing. (Emphasis added.)

The Board used what the parties have dubbed the "percentage of revenues" method to arrive at the figure of $185,686. VEC argues vehemently that this constituted a violation of the plain language of 30 V.S.A. § 226(b). VEC's preferred method of calculating the amount of recoupment, the "allowed earnings" method, yields a figure of $445,195. Its fallback position, the "rate schedule" method, yields $211,517.

The Board's explanation of the percentage of revenues method it used is as follows:

Under this method, the revenues received during the recoupment period are increased by the same percentage increase awarded the utility over test year revenues. [Here, the increase is 7.8 per cent.] Those increased revenues result in net operating earnings which would have been generated had the rate level finally approved by the Board been in effect during the suspension period. The method is consistent with both the language and purpose of the statute: the utility receives the revenues and earnings it would have received during the suspension period had the increase authorized by the Board been implemented on the effective date.

 As we have noted in the past, "It is a 'venerable principle that construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.' " *Committee to Save the Bishop's House, Inc.* v. *Medical Center Hospital of Vermont, Inc.*, 137 Vt. 142, 150–51, 400 A.2d 1015, 1019–20 (1979) (quoting *Red Lion Broadcasting Co.* v. *Federal Communications Commission*, 395 U.S. 367, 381 (1969)). The computation of the amount due in recoupment is within the competence and expertise of the Board. *In re Green Mountain Power Corp.*, 136 Vt. 170, 177, 385 A.2d 1110, 1114 (1978). This Court will not interfere with the Board's informed judgments about recoupment, *In re Village of Stowe Electric Department*, 134 Vt. 559, 564, 367 A.2d 1056, 1059 (1976), absent a showing

that the decision exceeded its expertise, technical competence and specialized knowledge. *Id.* at 563, 367 A.2d at 1059.

VEC's argument that the Board's order violates the plain meaning of the language of the statute seizes on some of the statute's words, and neglects to account for the presence of others. VEC states the real issue here as the meaning of the phrase "net operating earnings," as used in 30 V.S.A. § 226(b). "Net earnings," VEC says, is commonly understood to be the gross receipts of a business less operating expenses, which is often also considered equivalent to net profits. Even assuming, arguendo, that this definition is proper, VEC's argument fails.

■ VEC argues that the statute requires use of a formula which actually compares "net operating earnings" under the old rates with the "net operating earnings" generated by the new, and awards the difference as the recoupment amount. However, the plain language of the statute indicates otherwise. Use of the phrase "net operating earnings" in the statute does not require that the formula used to calculate recoupment actually contain "net operating earnings" among its variables. Rather, the statute explicitly requires only that the bottom line "shall *represent*" the difference between what the utility actually earned and what it would have earned if the rates finally approved had been in effect on the first day of the recoupment period. Thus, we are satisfied that the Board's formula did not violate the plain language of the statute.

VEC also argues that the Board's use of the "percentage of revenues" method for calculating recoupment deprives the utility of the due process protections guaranteed by the Fourteenth Amendment to the United States Constitution. This argument is without merit. The "percentage of revenues method" complies with the statutory requirement to award to the utility a sum representing the difference between what it would have earned if the new rates had been in effect on the first day of the recoupment period and what it actually earned during that period. Here, the Board awarded VEC rates which would produce additional retail revenues in the amount of $411,989 for the test year ending April 30, 1980. VEC did not appeal the amount of that rate increase. The recoupment award approved by the Board allows VEC to collect $185,686

for the six-month period from July 1 through December 31—
the summer and fall of 1980. The allocation for the recoup-
ment period is fair and reasonable in light of the unappealed
rate increase awarded. See *Petition of New England Tele-
phone & Telegraph Co.*, 120 Vt. 181, 190, 136 A.2d 357, 363–64
(1957).

 Since Vermont was the only state in the nation to per-
mit recoupment, until the enactment of No. 226 of the Ad-
journed Session 1981 which repealed the provision for recoup-
ment, it is plain that the Board has no constitutional obliga-
tion to award VEC any amount in recoupment whatsoever,
so long as the prospective rates are just and reasonable. See
*Federal Power Commission* v. *Hope Natural Gas Co.*, 320
U.S. 591 (1944); *Bluefield Water Works & Improvement Co.*
v. *Public Service Commission*, 262 U.S. 679 (1923).

VEC argues that even if some formula is acceptable which
does not explicitly use "net operating earnings" among its
variables, the Board's formula is still erroneous. The Board's
"percentage of revenues" method multiplied VEC's revenues
during the recoupment period by 7.8 per cent, the amount of
the rate increase finally approved, to get a figure of $185,686.
VEC insists that the 7.8 per cent rate increase should be first
translated into the average increase per kilowatt hour, and
then that figure should be multiplied by the number of kilo-
watt hours actually sold during the recoupment period. This
approach yields a figure of $211,517.

 Ordinarily, the two methods yield the same result. In
this case, however, the Board found that "The kilowatt hour
recoupment calculation proposed by VEC produces a different
result from the percentage method because of the way VEC
books kilowatt hour sales to special billing customers." The
finding was not challenged, and constitutes adequate grounds
for the Board to proceed as it did.

Since the Board's formula was consistent with the statutory
language and did not violate the Fourteenth Amendment to
the United States Constitution, we need not address the pro-
priety of the "allowed earnings" approach advocated by VEC.

*Affirmed.*